UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 10 B 50703 |
| GLORIA J. KORNER, | ) | |
| | ) | |
| Debtor. | ) | Chapter 7 |
| | ) | |
| ———————————— | ) | |
| | ) | |
| BEERMANN SWERDLOVE LLP, an | ) | |
| Illinois Limited Liability Partnership, | ) | Adv. No. 11 A 1012 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Judge Pamela S. Hollis |
| GLORIA J. KORNER, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This matter comes before the court following trial on the complaint brought by Beermann

Swerdlove LLP against Gloria Korner, seeking denial of her discharge pursuant to 11 U.S.C. §

727(a)(4)(A). The court heard the testimony of witnesses and received exhibits into evidence.

The court ruled on the parties' motions *in limine* during the course of the trial.

For the reasons stated below, the court enters judgment in favor of Beermann Swerdlove.

Judgment will be entered for the Plaintiff and Defendant's discharge will be denied.

## FINDINGS OF FACT

Gloria and Richard Korner were married on November 12, 1994. Tr. at 141.[1] They had

three children during the marriage. Tr. at 142. On June 10, 2009, Gloria filed for divorce. Tr. at

154. She retained Thomas Field of Beermann Swerdlove to represent her in the dissolution

---

[1] Tr. at ___ refers to the official transcript of the trial held on April 5, 2012.

proceeding and ancillary matters. Tr. at 130. Eventually a judgment for dissolution of marriage ("Dissolution Judgment") was entered on March 31, 2010. **Pl. Ex. A**.

The Dissolution Judgment incorporated a 32 page Marital Settlement Agreement ("MSA") as well as a custody and joint parenting agreement. **Pl. Ex. A**, Tr. at 131. It was the work of Richard's attorney, Gloria's attorney Thomas Field, and Howard Rosenberg, an attorney appointed by the court to represent the Korners' children in the dissolution proceeding. Tr. at 132-133.

Gloria filed for relief under Chapter 7 of the Bankruptcy Code on November 12, 2010. Her original 341 meeting was held on January 25, 2011 with case trustee Neville Reid. Two continued meetings were held on February 9 and February 24, 2011.

### Richard Did Not Make All Payments Required by the MSA, and in Her Schedules and SOFA Gloria Did Not Disclose All Amounts to Which she was Entitled under the MSA.

According to the MSA, from April 1, 2010 until December 1, 2010, Richard was to pay Gloria $1,500 for support of herself and the children. **Pl. Ex. A**. On average, she received that amount during those six months. Tr. at 155; **Def. Ex. K**.

At the time the Dissolution Judgment was entered, the marital home at 3585 Tamarind Drive in Northbrook, Illinois (the "Tamarind Property") was listed for sale. In addition to the $1,500 monthly support payment, Richard was required to pay the expenses (utilities, mortgage and real estate taxes) related to the Tamarind Property until it was sold or foreclosed upon, but in no event later than December 1, 2010. **Pl. Ex. A**. Richard paid none of these expenses. Tr. at 156. At the time of trial, Gloria was still living in the Tamarind Property, although it was no longer for sale and foreclosure proceedings had commenced. Tr. at 19-20.

Starting on January 1, 2011, or when the Tamarind Property sold, whichever occurred first, the amount of Richard's unallocated maintenance and child support obligation was set to

[2]

increase to $3,500. **Pl. Ex. A**. That amount was reviewable after 36 months. In addition, Richard was required to pay Gloria 40% of any gross amount of bonuses and/or distributions in excess of $105,000. **Pl. Ex. A**.

In answer to Question 17 on Schedule B, which asks for information about alimony, maintenance, support, and property settlements, Gloria checked "none." **Pl. Ex. E**; Tr. at 58. She included a monthly support payment of $1,500 on Schedule I. **Pl. Ex. E**; Tr. at 72. Schedule I asks whether a debtor reasonably anticipates any increase or decrease in income in the next year, and despite the MSA provision that Richard's unallocated maintenance and child support payments were due to increase by $2,000 in less than two months, Gloria wrote "none." **Pl. Ex. E**; Tr. at 72-73. She did include an anticipated change in mortgage/rent payments on Schedule J. **Pl Ex. E**; Tr. at 73.

Although Gloria testified that she never received more than $1,500 from Richard after his obligation increased to $3,500, Tr. at 160, she did receive $2,340.62 in February 2011 and $1,975.89 in June 2011. **Def. Ex. N**. On average, however, postpetition payments from Richard to Gloria were much less than $1,500 per month and never approached the required $3,500. Tr. at 159; **Def. Ex. N**.

In light of Richard's failure to pay the expenses related to the Tamarind Property, Gloria had not expected him to pay the additional $2,000 beginning in January 2011. Tr. at 160-161. Beermann Swerdlove's attorney asked Gloria at her original 341 meeting whether she understood that Richard's obligation increased to $3,500 on January 1, 2011. "Well, I understood it, but Richard is not following anything in that divorce decree. So I didn't know what – if I was going to be entitled or really going to get that $3,500." **Def. Ex. A** at 14.

[3]

Gloria is no longer entitled to child support payments from Richard, and at the time of trial was receiving no income at all from him. Tr. at 162. His support obligation was terminated on September 21, 2011. Tr. at 164. Gloria believes that she will never be able to collect unpaid maintenance and child support payments from Richard unless she pursues him in court. Tr. at 162.

## The MSA Distributed the Korners' Personal Property.

The MSA provided that Gloria would receive all personal property located at the Tamarind Property, with certain exceptions listed on Exhibit B. These exceptions included a set of fine china, kitchen implements, a smoker/BBQ, a Sandy Koufax autographed baseball, a framed Carlo Gambino cancelled check, magazine and album collections, a Gateway computer, a receiver and speaker system, a stamp collection (appraised at a few hundred dollars) and outdoor furniture. Richard was also entitled to two leather couches, two end tables and one additional couch. **Pl. Ex. A**. He picked up some of the items to which he was entitled, but not all. Tr. at 104-105. When asked in Question 14 on her SOFA to list all property owned by another person that she holds or controls, however, Gloria answered "None." **Pl. Ex. E**.

On the date the Dissolution Judgment was entered, Gloria and Richard were disputing the disposition of four televisions. Gloria was eventually awarded the master bedroom ($1,750 - $2,500) and basement ($800-$1,500) televisions. Richard received the other two televisions. **Pl. Ex. B**.

In answer to Question 10 on her Statement of Financial Affairs, which asks for a list of transfers of property, Gloria checked "none." **Pl. Ex. E**; Tr. at 79-80. She also testified at her original 341 meeting on January 25, 2011, that she had not sold anything, given anything away or had anything taken away during the four years prior to filing bankruptcy. **Def. Ex. A** at 4; Tr. at 104.

[4]

A few minutes after hearing that Gloria had not sold anything, given anything away or

had anything taken away, her trustee specifically asked about transfers relating to the divorce:

Q:    In your divorce did you surrender any property to anybody?

A:    No.

Q:    Well, to your ex-husband?

A:    No.

Q:    So what – there was no property division in the divorce?

A:    I'm sorry.  I reside in the foreclosed home right now.

Q:    All right.  Did you surrender or give anything to your ex-husband in that divorce
proceeding?

A:    Did I give him anything?

Q:    Did you surrender anything that you used to have an interest in?  Like if you had
interest in a car or business and you gave it to him as part of the property settlement.  Did you
give up anything?

A:    I gave up – we had a Lincoln Navigator.

**Def. Ex. A** at 6-7.  A discussion of the Lincoln Navigator, its promissory note and other

related issues continued for several minutes, then the trustee concluded his questioning.

Gloria was asked at trial to explain why, at the 341 meeting, she denied surrendering any

property to Richard:

Q:    And do you see at line 9 where Mr. Reid asks you in your divorce did you
surrender any property to anybody, and you said no?  And line 12, question by Mr. Reid, well, to
your ex-husband, and your answer is no?

A:    Again, he didn't pick up the things. I don't know the exact time he didn't pick up –
or he picked up the things at my home, but he did most recently. I can't tell you the exact date.
And if I said no at that time, it was no.

Q:    Well, the marital settlement agreement had already been entered.

A:    Oh, absolutely.

Q:    Right.

A:    It took him forever to –

Q:    And he –

A:    -- get his things. And he, again, still has the few items I've told you about.

Q:    Okay. But the point is, though, that at the time of your bankruptcy, you surrendered your interest in certain marital assets to Richard pursuant to the agreement, correct?

A:    Correct.

Q:    And that includes the Sandy Koufax autographed ball, it included the stamp collection, it included the album collection, and all those items that we talked about on Exhibit B attached to the marital settlement agreement; isn't that correct?

A:    That is correct.

Tr. at 106, line 23 – page 108, line 2.

Gloria received all other personal property in the house. She valued all of her household goods on Schedule B at $1,500, including bedding, furniture, kitchen appliances, tables, chairs and televisions. **Pl. Ex. E**; Tr. at 58. She based that valuation on the resale value of her personal property. Tr. at 142. At trial, however, Gloria testified to the following values:

Family room couch, $800

Living room piano, $200 (promised but not awarded to Richard)

Living room furniture, $100

Breakfast room table, $400

Breakfast room chairs, $240-$300

Breakfast room buffet, $200

Breakfast room chandelier, $250-$300 (retail)

Master bedroom furniture, $400

Additional bedroom furniture, $300

[6]

Tr. at 86-97. In general, the condition of her personal property is not excellent: "Twelve-year-old boys, it's not in the best of condition." Tr. at 115.

There are two framed sports jerseys in one of the bedrooms, a Michael Jordan jersey and a Dan Marino jersey. At trial, Gloria valued the Jordan jersey at $1,000 and the Marino jersey at $700. Tr. at 98-99.

The total value of these household goods is approximately $3,000, plus the master bedroom and basement televisions. This total does not include the sports jerseys, which belong to Gloria's children. Tr. at 115.

At some point during her marriage and after dissolution proceedings began, Gloria drove a Lincoln Navigator. After Gloria was in an accident with the Navigator, she learned that Richard's check to pay the insurance had bounced, and the vehicle was uninsured. Gloria gave the Navigator back to Richard and she was then awarded the 1995 Mercedes Benz. Tr. at 42-47. Subsequently, the Mercedes, which Gloria owned free and clear of liens, was totaled in an accident. There were no insurance proceeds payable to Gloria. Tr. at 21-22. Although she took a different position at the hearing on the Dissolution Judgment, Gloria no longer asserts a claim against Richard for the Navigator. Tr. at 47-48.

In answer to Question 25 on Schedule B, which asks whether she owns any automobiles, Gloria checked "none." **Pl. Ex. E**; Tr. at 59. At the time she filed for relief under the Bankruptcy Code, her license had been suspended. It remained suspended at the time of trial. Tr. at 59-60. Attorney Bob Stringini represented Gloria with regard to the tickets that resulted in her suspended license. She knew that she owed him unpaid attorney's fees at the time she filed her bankruptcy petition, although she did not know exactly how much. Tr. at 65 and 75. He is listed neither in Gloria's original Schedule F nor her amended Schedule F.

[7]

**Many of the Debts Allocated to Gloria in the MSA Were Not Listed on Her Schedules, and the Schedules and Statement of Financial Affairs Contain Other Omissions.**

Exhibit C to the MSA allocated certain debts between Gloria and Richard, and each indemnified the other with respect to those liabilities. **Pl. Ex. A.**

Richard indemnified Gloria with respect to the income tax liability for the year 2006, described on Exhibit C to the MSA as a debt in the amount of $31,315.00. **Pl. Ex. A.** Gloria testified that because the income tax liability was attributable to income earned by Richard, her attorneys worked out the indemnification agreement. Tr. at 147. Nevertheless, she listed the Internal Revenue Service on Schedule E with a claim in the amount of $32,596.13. **Pl. Ex. E**; Tr. at 146. When asked why she listed the Service as a creditor if Richard had indemnified her for this debt, Gloria testified: "Because my ex-husband did not pay one bill since '09." Tr. at 147, lines 19-20. She did not believe that he would indemnify her for the debt owed to the Internal Revenue Service. Id.

At her continued 341 meeting on February 9, in response to a question from Beermann Swerdlove's attorney, Gloria testified that the indemnification agreement was not as straightforward as it appeared: "I spoke to the I.R.S., and I have to take this further to a civil suit or something against that whole $32,000 that he owes." **Def. Ex. C** at 5.

The Internal Revenue Service had placed a lien on Gloria's assets based on the 2005 and 2006 tax debt. It released the liens on December 23, 2011, most likely after receiving notice of her discharge. **Def. Exs. H and I.**

Gloria listed neither on her original Schedule F nor on her amended Schedule F a default judgment in the amount of $13,353 entered against her and in favor of CACH, LLC on August 18, 2008. Gloria was aware of this judgment and aware it had not been paid. Tr. at 35-36.

[8]

The MSA allocated eighteen (18) debts to Gloria in the total amount of $14,970. **Pl. Ex. A**; Tr. at 33. Gloria did not pay any of these debts. Tr. at 33-35. Only three of these eighteen debts[2] were listed on either her original or her amended Schedule F. **Pl. Ex. E**; Tr. at 68; Case No. 10 B 50703, EOD 12 (Feb. 7, 2011). Three of the creditors listed on her amended Schedule F are identified as "collections" or "collection attorney." Tr. at 127; Case No. 10 B 50703, EOD 12 (Feb. 7, 2011).

If the Tamarind Property had been sold, $14,500 would have been distributed to Howard Rosenberg on account of his fees as the child representative in the marital dissolution case, and $30,000 each would have been paid to Gloria's and Richard's attorneys. **Pl. Ex. A**. The MSA does not describe who is responsible for Rosenberg's fees if the house was not sold. Gloria's former attorney Thomas Field testified that since Rosenberg's fees were incurred during the marriage, they constitute a marital debt, and thus a joint liability of both Korners. Tr. at 134-135.

Gloria testified that she thought Richard was responsible for Rosenberg's fees. Tr. at 25. She also testified, however, that Richard's sole liability for Rosenberg's fees came about only after she filed for relief under the Bankruptcy Code:

> Q.     Okay. So it was only after the filing of the bankruptcy case that you had another lawyer [besides Beermann Swerdlove] go into that case, correct?
>
> A.     Correct.
>
> Q.     And is that what you're referring to with respect to Richard paying Rosenberg –
>
> A.     Yes.
>
> Q.     -- for the new services that he was going to render, Howard Rosenberg render, in the new part of the case after your bankruptcy filing, correct?
>
> A.     The – there was a balance and new fees.

---

[2] Care Credit ($1,807 debt described in MSA is the same amount as owed to Paragon Way, a collection attorney, on Schedule F), Victoria's Secret and Macy's. Anatol Dubinsky [sic] is listed on Schedule F, but not on Exhibit C to the MSA. Dublinsky v. Gloria Korner is discussed in a separate provision of the MSA.

Q.    Okay. Was there an order entered in the dissolution of marriage action prior to November 10 – no, November 12, I'm sorry, of 2010 when you filed your bankruptcy case –

A.    No.

Q.    -- requiring Richard to pay Rosenberg?

A.    No.

Tr. at 26, line 21 – page 27, line 14. Gloria did not list Rosenberg on either her original or her amended Schedule F. **Pl. Ex. E**; Tr. at 68.

Gloria did not list the lawsuit <u>Dublinsky v. Gloria Korner</u> in answer to Question 4 on her Statement of Financial Affairs, which asks about actions pending within the year prior to filing for relief under the Bankruptcy Code. **Pl. Ex. E**. She admitted at trial that it should have been listed. Tr. at 79.

In March 2011, Gloria received a tax refund for the year 2010. Tr. at 80-81. Additionally, there was a colloquy with Beermann Swerdlove's attorney at her 341 meeting regarding Gloria seeking reimbursement of approximately $8,000 in utilities and attorneys' fees from Richard. **Def. Ex. A**. "He has not paid for anything. So I hope to get it. But as of right now, it doesn't look too good." **Def. Ex. A** at 16.

In answer to questions 18 and 21 on Schedule B, however, Gloria checked "none" when asked whether she had any liquidated (Question 18) or contingent and unliquidated claims (Question 21) of any nature, including tax refunds, counterclaims and rights to setoff. **Pl. Ex. E**; Tr. at 58-59 and 80-82.

Gloria listed only one bank account at Chase Bank on her Schedule B, although at the time she filed for relief under the Bankruptcy Code on November 12, 2010, she had two accounts. Tr. at 57. By 2011, she had consolidated the two accounts. Tr. at 57-58.

[10]

When asked in Question 3(c) on her Statement of Financial Affairs to list all payments made during the year prior to filing her bankruptcy case to or for the benefit of creditors who are or were insiders, Gloria checked "none." **Pl. Ex. E**. However, she testified at trial that during that time period she repaid her parents some of the funds they had advanced to her, "I want to say a total of maybe a thousand." Tr. at 76, lines 20-21. She confirmed that this repayment was made during the year prior to her bankruptcy filing. Tr. at 77.

## CONCLUSIONS OF LAW

Objections to discharge are construed strictly against the objecting creditor and liberally in favor of the debtor. See In re Kontrick, 295 F. 3rd 724, 736 (7th Cir. 2002), aff'd, Kontrick v. Ryan, 540 U.S. 443 (2004). According to the Federal Rules of Bankruptcy Procedure, "[a]t the trial on a complaint objecting to a discharge, the plaintiff has the burden of proving the objection." Fed. R. Bankr. P. 4005. In the Seventh Circuit, the objecting creditor must establish grounds for denial of discharge by a preponderance of the evidence. In re Scott, 172 F. 3rd 959, 966-67 (7th Cir. 1999).

Beermann Swerdlove seeks denial of Gloria's discharge pursuant to 11 U.S.C. § 727(a)(4)(A):

    **(a)**    The court shall grant the debtor a discharge, unless—

        **(4)**    the debtor knowingly and fraudulently, in or in connection with the case--

            **(A)**    made a false oath or account; . . .

In order "to prevail on a claim under this subsection, the [plaintiff] must prove by a preponderance of the evidence that: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with

[11]

fraudulent intent; and (5) the statement related materially to the bankruptcy case." Stamat v. Neary, 635 F. 3ʳᵈ 974, 978-79 (7ᵗʰ Cir. 2011) (string citations omitted).

**Gloria Made Fifteen Statements Under Oath.**

"A debtor's petition, schedules, statement of financial affairs, statements made at an 11 U.S.C. § 341 meeting, and answers to interrogatories all constitute statements under oath for purposes of § 727(a)(4)." Fiala v. Lindemann, 375 B.R. 450, 469 (Bankr. N.D. Ill. 2007) (citations omitted). Gloria made the following statements or omissions under oath:

1. She listed only one Chase Bank account on Schedule B.

2. She valued all of her household goods at $1,500 on Schedule B.

3. When asked at item 17 of Schedule B whether there are any alimony, maintenance, support, and property settlements to which she is or may be entitled, she answered "None."

4. When asked at item 18 of Schedule B whether there were any tax refunds owed to her, she answered "None."

5. When asked at item 21 of Schedule B whether she had any contingent and unliquidated claims against anyone, she did not disclose the claim against Richard for approximately $8,000 in utilities and attorneys' fees.

6. Schedule E identifies $32,596.13 in tax debt owed to the IRS without the clarification that Richard indemnified her.

7. She did not list a judgment in the amount of $13,353 entered against her and in favor of CACH, LLC on either her original or amended Schedule F.

8. She did not list the debt owed to attorney Stringini on either her original or amended Schedule F.

9. She did not list the debt owed to Rosenberg on either her original or amended Schedule F.

[12]

10.  On Schedule I, she identified $1,500 per month in "Alimony, maintenance or support payments."

11.  When asked in Schedule I to describe any increase or decrease in income reasonably anticipated to occur within the following year, she answered "None."

12.  When asked in Question 3(c) on her SOFA to list all payments made within one year immediately preceding the commencement of this case to or for the benefit of creditors who are or were insiders, she answered "None."

13.  When asked in Question 10 on her SOFA and at her 341 meeting to list all other property transferred either absolutely or as security within two years immediately preceding the commencement of this case, she answered "None."

14.  When asked in Question 14 on her SOFA to list all property owned by another person that she holds or controls, she answered "None."

15.  She listed on her original and amended Schedule F only three of the eighteen obligations that the MSA provided she was to assume.

## Thirteen of The Fifteen Statements Were False.

1.  Gloria had two bank accounts at Chase at the time she filed for relief under the Bankruptcy Code, while only one was listed on schedule B. Although she eventually consolidated the two accounts, she did not do so until 2011. Therefore, this was a false oath.

2.  On Schedule B, Gloria valued her household goods at $1,500. According to her testimony, however, her household goods are worth approximately $3,000. Additionally, she has at least two televisions, one of which Richard valued at $1,750 and Gloria valued at $2,500. Therefore, the $1,500 valuation was a false oath.

[13]

3.  When asked at item 17 of Schedule B whether there are any alimony, maintenance, support, and property settlements to which she is or may be entitled, Gloria answered "None." The MSA provided for $1,500 support payments. Therefore, this omission was a false oath.

4.  When asked at item 18 of Schedule B whether there were any tax refunds owed to her, Gloria answered "None." In March 2011, however, Gloria received a tax refund for the year 2010. Therefore, this omission was a false oath.

5.  When asked at item 21 of Schedule B whether there were any contingent and unliquidated claims owed to her, Gloria answered "None." But at her 341 meeting ten weeks later, she testified to an $8,000 claim against Richard for unpaid utilities and attorney fees. Therefore, this was a false oath.

6.  Schedule E identifies $32,596.13 in tax debt owed to the IRS without the clarification that Richard indemnified her. Gloria argues that she listed the Service's debt because it still held her responsible. The IRS did not release its lien against her until December 2011. While it was reasonable of her to list the debt, the false oath was the omission of any indication that Richard had been assigned liability for it in the MSA.

7.  Gloria did not list on either her original or amended Schedule F a judgment in the amount of $13,353 entered against her and in favor of CACH, LLC. This omission was a false oath.

8.  Gloria's failure to list on Schedule F the debt owed to Stringini was a false oath.

9.  Gloria's failure to list on Schedule F the debt owed to Rosenberg was a false oath.

10. On Schedule I, Gloria identified only $1,500 per month in "Alimony, maintenance or support payments." This was not a false oath. At the time she filed Schedule I, that is the amount Gloria was due under the MSA. Moreover, no evidence was introduced to support

[14]

the conclusion that at the time she filed Schedule I she was receiving a percentage of Richard's salary or bonus.

11.   When asked in Schedule I to describe any increase or decrease in income reasonably anticipated to occur within the following year, Gloria answered "None." This was a false oath, because the amount Richard was required to pay her was due to increase less than two months later. Moreover, there was a possibility that in 2011 she might receive a percentage of Richard's salary or bonus.

12.   When asked in Question 3(c) on her SOFA to list all payments made within one year immediately preceding the commencement of this case to or for the benefit of creditors who are or were insiders, Gloria answered "None." This was a false oath, because she paid approximately $1,000 to her parents during that year.

13.   When asked in Question 10 on her SOFA and at her 341 meeting to list all other property transferred either absolutely or as security within two years immediately preceding the commencement of this case, Gloria answered "None." This was <u>not</u> a false oath. Although the MSA provided that Richard was to receive certain personal property, Gloria testified that much of the personal property to which Richard is entitled is still in her possession at the Tamarind Property (which bears on the matter below, at item 14). She further testified that the items Richard did collect were picked up recently. Therefore, her answer to Question 10 was not a false oath.

14.   When asked in Question 14 on her SOFA to list all property owned by another person that she holds or controls, Gloria answered "None." This was a false oath because Gloria was holding property that Richard had been awarded under the MSA but had not yet collected.

[15]

15.    Gloria scheduled only three of the obligations that the MSA provided she was to assume. She argued in her post-trial brief that several creditors were added to her amended Schedule F. Gloria is correct that many new claims were added in her amended Schedule F, but the three MSA obligations were already included in the original Schedule F. Fifteen of the eighteen debts described in the MSA as Gloria's responsibility were not included in either the original or amended Schedule F. Omission of these debts was a false oath.

## Gloria Knew That Twelve of the Thirteen False Statements Were Omissions or Misstatements.

1.    The parties stipulated that there were two Chase accounts in existence on the date Gloria filed for relief under the Bankruptcy Code. Gloria testified that she did not know exactly when she consolidated the accounts, but that it was sometime in 2011. Therefore, she knew that listing only one account at Chase was a false oath.

2.    Gloria valued her household goods at $1,500 on Schedule B, although the testimony that she gave supported a value of at least $3,000. She was the person who valued the property both on her schedules and at trial. Presumably she had spent some time thinking about the value of the property as it had only recently been awarded to her in the dissolution action. Therefore, she knew that her statement on Schedule B was a false oath.

3.    Based on her testimony at trial, Gloria was keenly aware of the effects of the divorce action. She clearly knew that there were alimony, maintenance, support or property settlements to which she was or would be entitled. Gloria's reasons for omitting them will be discussed in the section below, but since she knew she was entitled to these payments, she knew that her statement on Schedule B that there were no alimony, maintenance, support, and property settlements to which she is or may be entitled was a false oath.

[16]

4.   There was no evidence to support a finding that in November 2010, Gloria knew that she

would receive a tax refund four months later. Therefore, Plaintiff has not proved that

Gloria knew on November 12, 2010, that omitting the tax refund she was to receive in

March 2011 was a false oath.

5.   At the time she filed her bankruptcy petition and again ten weeks later at her 341 meeting,

Gloria intended to pursue Richard for unpaid utilities and attorneys' fees in the approximate

amount of $8,000. Although she believed she was unlikely to recover the money, she knew

that she had a claim and that Richard was obligated to pay her under the Dissolution

Judgment. Therefore, she knew that her failure to list this potential asset was a false oath.

6.   Gloria knew that Richard indemnified her on the tax debt. The reason she did not list him

as a codebtor will be discussed in the section below. Therefore, she knew that omitting his

liability on the indemnification agreement was a false oath.

7.   Gloria knew about the judgment in favor of CACH, LLC and that it had not been paid.

Therefore, she knew that omitting this debt from Schedule F was a false oath.

8.   Gloria knew that she owed Stringini unpaid attorney's fees. Therefore, she knew that

omitting his debt from Schedule F was a false oath. She argues in her post-trial brief that if

she had listed the debt, Stringini would not have represented her in the criminal proceeding.

First, no evidence was presented at trial to support this argument. Second, by arguing that

"the debt should have technically been listed," she admits to knowing that its omission was

a false oath. Moreover, this argument leads to a dangerously slippery slope. Should

debtors be allowed to pick and choose the debts they list depending on the effect such

listing might have? They certainly should not. The Bankruptcy Code specifically provides

that "nothing . . . prevents a debtor from voluntarily repaying any debt." 11 U.S.C. §

[17]

524(f).  Gloria should have listed Stringini and she knew that her deliberate omission of his debt was a false oath.

9.    Gloria testified that she believed that only Richard would be liable for Rosenberg's fees. While that may now be the case, at the time she filed her bankruptcy petition both she and Richard were liable to Rosenberg.  The testimony at trial showed that the change to sole liability for Richard occurred <u>after</u> the bankruptcy case was filed, <u>after</u> she hired a new attorney in the dissolution proceeding.  Therefore, Gloria knew at the time she filed for relief under the Bankruptcy Code that omitting Rosenberg's debt from Schedule F was a false oath.

10.   This statement was not a false oath.

11.   Gloria knew that Richard's payments to her were due to increase in January.  Therefore, she knew that answering "none," when asked in Schedule I to describe any increase or decrease in income reasonably anticipated to occur within the following year, was a false oath.  Her reasons for this answer will be discussed below, in the section on fraudulent intent.

12.   Gloria knew that she paid her parents "a total of maybe a thousand" dollars during the year prior to her bankruptcy filing.  Therefore, she knew that answering "none," when asked in Question 3(c) on her SOFA to list all payments made within one year immediately preceding the commencement of this case to or for the benefit of creditors who are or were insiders, was a false oath.

13.   This statement was not a false oath.

14.   Gloria knew that Richard had been awarded certain personal property under the MSA, and that he was taking "forever" to pick up the property to which he was entitled.  When explaining why she did not list any property transfers, Gloria was quite emphatic that most

[18]

of the personal property to which Richard was entitled was still in her possession.

Therefore, she knew that it was a false oath to answer "none" when asked in Question 14 on

her SOFA to list all property owned by another person that she holds or controls.

15.  Gloria knew that she was liable for the obligations described in the MSA and that fifteen of

the eighteen MSA obligations were not listed on either the original or the amended

Schedule F. Therefore, she knew her failure to list these obligations was a false oath.

### All of the False Statements That Gloria Knew Were Omissions or Misstatements Related Materially to the Bankruptcy Case.

As this factor can be summarily disposed of, it will be discussed out of order.  Facts are

material if they "concern[] the discovery of assets, business dealings, or the existence and

disposition of the debtor's property." Stamat, 635 F. 3rd at 982 (quotation omitted).  False oaths

may be material even where they do not result in any prejudice to creditors. Id.  Her case

trustee's decision to issue a no asset report is not a finding that Gloria's misstatements are

immaterial.

All of the statements listed above that were false, and that Gloria knew were false, related

materially to her bankruptcy case.  These statements involved bank accounts, valuation of her

personal property, potential reimbursements, indemnification for a debt, missing creditors,

payments to insiders and property transfers.  All were made in connection with her bankruptcy

schedules and Statement of Financial Affairs.

Therefore, the only remaining question is whether Gloria acted with fraudulent intent

when she made the statements that she knew were false.

### A Presumption Arose That Gloria Made These Twelve False Statements and Omissions With Fraudulent Intent, and Gloria Failed to Rebut This Presumption.

"Intent to defraud involves a material representation that you know to be false, or, what

amounts to the same thing, an omission that you know will create an erroneous impression." In

re Chavin, 150 F. 3rd 726, 728 (7th Cir. 1998) (citations omitted). A reckless disregard for the truth is sufficient to prove fraudulent intent. Stamat, 635 F. 3rd at 982.

In many cases, direct evidence of fraudulent intent is unavailable. Therefore, fraudulent intent may be inferred from circumstantial evidence. In the Seventh Circuit, the factors known as "badges of fraud" from which fraudulent intent may be inferred include:

> (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry.

Village of San Jose v. McWilliams, 284 F. 3rd 785, 791 (7th Cir. 2002) (quotation omitted). If even one of these factors is satisfied, a presumption of fraudulent intent arises. The burden is then shifted to the debtor to rebut that presumption. Cantwell & Cantwell v. Vicario, 464 B.R. 776, 791 (N.D. Ill. 2011) (citation omitted).

The key factor in this case is "the existence or cumulative effect of the pattern . . . or course of conduct." Gloria did not omit just one or two items from her schedules and SOFA. Instead, there is a pattern of omission. "[T]he cumulative effect of false statements may, when taken together, evidence a reckless disregard for the truth sufficient to support a finding of fraudulent intent." In re Duncan, 562 F. 3rd 688, 695 (5th Cir. 2009) (citation omitted), cited with approval by Stamat, 635 F. 3rd at 982 ("Here, the totality of the Stamats' omissions and errors rises above mere negligence to the level of reckless disregard for the truth.").

The court is not particularly troubled by the under-valuation of Gloria's household goods. She testified credibly that the furniture, being subject to everyday use by her three children, is not in very good condition. Moreover, Gloria's

[20]

> valuation of [her] personal property does not raise a red flag. This court has
> reviewed thousands of Schedule B itemizations of personal property. The
> importance of valuing property on Schedule B is to provide the case trustee with
> an idea of whether it would be worth his or her time to inventory the property and
> conduct a liquidation sale for the benefit of creditors. This court recalls very few
> cases—out of the thousands reviewed as a panel trustee, attorney or judge—in
> which a trustee determined that the personal property of an individual, that is, the
> contents of the debtor's home, was so valuable that a sale would be held.

In re Oscarson, 2008 WL 2700000, *5 (Bankr. N.D. Ill. July 2, 2008).

More important are the many omissions concerning her future expectation of income, including causes of action against Richard, and her debts. Gloria argues that many of the omissions from her schedules and Statement of Financial Affairs were rectified by full and free disclosure at her original and continued 341 meetings. She asserts that her willingness to disclose at the meeting all of Richard's obligations under the MSA, and the fact that she believed he would never live up to those obligations, should cure their omission from her schedules and SOFA. As for the debt to the IRS, she believed she would have to commence a civil suit to confirm his liability.

Certainly there may be minor omissions from schedules that require clarification at a 341 meeting. A patient and thoughtful trustee will often elicit missing information through diligent questioning, and a complaint objecting to discharge need not follow. The issue in this case, however, is the sheer volume of omissions, misstatements and incorrect information in Gloria's bankruptcy filings. Although Gloria is not a businesswoman, and there was no evidence to suggest that she is experienced in financial matters, most of the relevant information would have been fresh in her mind following the well-documented end to her contentious marital dissolution proceeding. In that context, the court cannot help but conclude that Gloria acted with reckless disregard for the truth.

The court does not take lightly the denial of a debtor's discharge, and is mindful that objections to discharge are construed strictly against the objecting creditor. The manner in which these schedules were completed and amended, however, does not indicate a debtor who took to heart the responsibility of providing accurate information. Too many omissions were attributed to Gloria's beliefs about Richard's behavior. But the truth is that on average, Richard did pay his required $1,500 each month during 2010. Gloria's bankruptcy case was filed in November 2010. Although Richard did not pay the Tamarind Property expenses, on average Gloria received $1,500 per month during the months in 2010 that Richard was required to make those payments.

Even if Gloria's assumption that Richard would never pay the increased support amount in 2011 turned out to be true, why not disclose the anticipated increase and qualify it with a statement that the increase was unlikely to actually occur? Gloria made the decision not to disclose the court-ordered increase because she did not expect Richard to step up. "I understood it, but Richard is not following anything in the divorce decree. So I didn't know what – if I was going to be entitled or really going to get that $3,500."

In fact, Gloria's assumption was validated by later events. On average, after she filed her petition, Richard did not pay her anywhere close to $3,500 per month. Only once did he pay more than $2,000 in a single month. But whether or not to disclose the increased support was not her decision to make.

> It is not the debtor's responsibility to decide which assets are to be disclosed to creditors; rather, his job is simply to address each question and answer it accurately and completely.
>
> In re Costello, 299 B.R. 882, 899 (Bankr. N.D. Ill. 2003) (citation omitted).

Bankruptcy requires certain disclosures from debtors in order to obtain a discharge, and a debtor cannot decide which information to provide and which to omit. Gloria was required to

disclose any increase "reasonably anticipated to occur," and an increase mandated by a court judgment certainly fits that criterion. Gloria should have disclosed the potential increase, and could have included a note that the source of the increase is unreliable. Under-disclosure puts a debtor's discharge in jeopardy, as it did in this case.

When asked why she listed the IRS on her schedules if Richard had indemnified her, Gloria stated: "Because my ex-husband did not pay one bill since '09." She did not believe that he would indemnify her for that liability. She also testified that she spoke to the IRS regarding Richard's liability and was told that she would have to bring a civil suit against him. Again, this is an instance where under-disclosure created a false impression. Gloria should have laid out all the relevant information in her schedules and Statement of Financial Affairs so that her case trustee could make a fully informed decision without having the information dribble out over successive 341 meetings.

Moreover, most of the missing information only came to light at the 341 meetings when Beermann Swerdlove's attorney conducted his own questioning. If Beermann Swerdlove decided to skip the 341 meeting and instead conduct a 2004 examination, very few of the omissions and misstatements would have been corrected in the presence of Gloria's case trustee. "It is a debtor's role to carefully consider the questions posed and answer them accurately and completely." In re Chrispin, 2012 WL 3126807, *22 (Bankr. N.D. Ill. July 31, 2012) (citation omitted).

Gloria's omission from Schedule F of most of the debts listed on Exhibit C to the Dissolution Judgment is also very troubling. She had an easily accessible list of debts for which she knew she was liable, yet she did not include them on Schedule F, even when she had the opportunity to amend the schedule. How simple it would have been to copy this list into

[23]

Schedule F. Gloria's failure to do so demonstrates a reckless disregard for the full and complete

disclosure required to obtain a discharge in bankruptcy. Chapter 7 discharges provide debtors

with a fresh start, but they also require that debtor to lay out his financial history for the scrutiny

of his creditors and case trustee. When the willingness to provide the necessary information is

missing, a Chapter 7 discharge must remain out of reach.

     Gloria was a very credible witness. Her demeanor on the witness stand was forthright

and believable. It is the sheer weight of all the omissions and misstatements taken together,

however, that shifts the burden to Gloria to rebut a presumption of fraudulent intent, and this she

failed to do. Filing amended schedules would not have cured the original omissions, but it would

have gone a long way toward rebutting the presumption that she acted with reckless disregard for

the truth. "It is well established that the court may consider the debtor's subsequent voluntary

disclosure as evidence of innocent intent." In re McCarthy, 418 B.R. 745, 753 (Bankr. E.D. Wis.

2009) (citations omitted). See Bensenville Cmty. Ctr. Union v. Bailey, 147 B.R. 157, 165

(Bankr. N.D. Ill. 1992) (although amendments to schedules "cannot expunge the falsity of an

oath . . . subsequent disclosures are evidence of innocent intent") (citations omitted).

     In this case, however, even after various items were discussed at the 341 meeting and

omissions were brought to light, Gloria made only minor amendments to Schedule F and her

Statement of Financial Affairs. "[T]he existence of more than one falsehood, together with

[debtor's] failure to take advantage of the opportunity to clear up all inconsistencies and

omissions when he filed his amended schedules, constituted reckless indifference to the truth

and, therefore, the requisite intent to deceive." Matter of Beaubouef, 966 F. 2nd 174, 178 (5th Cir.

1992).

[24]

Gloria repeatedly argued in her post-trial brief that because she answered questions and provided additional information at her 341 meeting, she rebutted the presumption that she acted with a reckless disregard for the truth. The court reviewed the transcripts from the original and two continued 341 meetings. At the first meeting, Gloria was questioned for more than half the length of her meeting by the attorney from Beermann Swerdlove. At the second meeting, nearly all the questioning was done by the attorney from Beermann Swerdlove. The third meeting was extremely brief, and contained no testimony at all but instead a legal discussion between the trustee and Gloria's lawyer regarding her eligibility for Chapter 7.

While subsequent disclosures may be evidence of innocent intent, it is disingenuous to make this claim when the disclosures were the result of questioning by a party who was already familiar with the debtor's financial situation. Would these omissions have come to light without Beermann Swerdlove's vigorous participation? It is unlikely. Granting a discharge in this situation would not encourage debtors to provide full, honest and complete disclosure. It would instead suggest that as long as the debtor does not expect any of her creditors to have the resources, ability and knowledge to appear at her 341 meeting and ask uncomfortable questions, she can expect a discharge.

## CONCLUSION

For all of the reasons stated above, the court finds that Beermann Swerdlove has proved by a preponderance of the evidence that Gloria knowingly and fraudulently, in connection with this bankruptcy case, made a false oath or account. Judgment will be entered for the Plaintiff and Defendant's discharge will be denied.

Date: _____APR 1 8 2013_____        _____
                                         PAMELA S. HOLLIS
                                         United States Bankruptcy Judge